JESSE R. GOODMAN, JR., et al., Plaintiffs, *v.* LEON E. FISHER et al., Defendants.

Supreme Court, Ontario County, May 27, 1954.

*Robert M. Quigley* for plaintiffs.

*M. Maurice Chacchia* for defendants.

FRED D. CRIBB, Official Referee. This is an equity action for specific performance of a contract to purchase real estate located in the town of Phelps, Ontario County, New York. The contract consisting of a purchase offer and acceptance, dated July 28, 1952, is the basis for plaintiffs' action against the defendants. Plaintiff Jesse R. Goodman, Jr. obtained title to the premises described in the contract from Raymond J. Bennett, Commissioner of Public Welfare of Ontario County, by quitclaim deed dated July 19, 1951, and thereafter by warranty

deed dated July 21, 1951, conveyed said premises to himself and the other two plaintiffs to this action.

By the terms of the contract the defendants offered to purchase the lands and improvements owned by the plaintiffs for the sum of $4,500 of which $500 was to be paid on acceptance of the offer and the balance on date of transfer. The offer was accepted and plaintiffs deposited $500 in cash with the broker.

The defendants by their answer, after denying that plaintiffs are able to perform under the terms of the purchase offer and acceptance, set forth the following affirmative defenses: 1. That there are defects and a break in the chain of title as appears at Abstracts 2, 3, and 8 of the Abstract of Title. 2. That the alleged public sale by which the Commissioner of Public Welfare conveyed the lands to the plaintiff Jesse R. Goodman, Jr. was not in fact a " public sale " as provided by sections 106 and 223 of the Social Welfare Law. 3. That failure of the Commissioner of Public Welfare to properly file in the Ontario County Clerk's Office documents regarding the so-called public sale constitutes a defective record title justifying the defendants in refusing to accept the same. 4. That the deeds from predecessors in title to the Commissioner of Public Welfare having been given as securities were in effect mortgages rather than true conveyances of title. 5. That whereas the defendants were seeking one acre of land, the contract described the lands as being three fourths of an acre, while the plaintiffs as a matter of fact own only one half an acre and are therefore unable to perform according to the terms of the contract.

I find that the above affirmative defenses numbered " 3 " and " 4 " are without merit. I find no law requiring the public welfare official to file in the County Clerk's office proof of the publication of the notice of sale, record of bids received, approval of the State Department of Social Welfare and other documents pertaining to the sale. The deed from the Commissioner of Public Welfare to Jesse R. Goodman, Jr., one of the plaintiffs in this case, enumerates all such documents and states that they are on file in his office and are retained therein as permanent records. The affirmative defense above numbered " 4 " was not considered at the trial, or by counsel in his brief.

Defendants allege that the sale of the premises to plaintiff John R. Goodman, Jr. by the Commissioner of Public Welfare upon sealed bids was invalid as not being by " public sale " as

required by subdivision 3 of section 106 of the Social Welfare Law. Counsel have not submitted nor has my independent research revealed any New York authorities judicially determining this question. It therefore becomes necessary to determine whether the Legislature intended by the use of the term " public sale " to restrict the method of sales by the public welfare official to that of public auction by oral bids, or intended that the term " public sale " should also include sales by sealed bids.

Contending that a sale by sealed bids does not constitute a public sale as provided by subdivision 3 of section 106 of the Social Welfare Law the defendants rely principally upon judicial decisions rendered in several sister States. (See *Offredi* v. *Huhla,* 135 Conn. 20, 4 A. L. R. 2d 572, and " What constitutes a ' public sale ' ", 4 A. L. R. 2d 575.) Nevertheless, supported by a ruling of the Attorney-General that the term " public sale " as used in said subdivision 3 included both sales by oral bidding at public auction and by receiving sealed bids, made soon after subdivision 3 became effective (1947 Atty. Gen. 255), the public welfare officials in many counties of New York adopted the method of sales by sealed bids while others have used the public auction method by oral bidding, and still others have used both methods. Plaintiffs' attorney wrote the public welfare officials of twenty-eight counties having relatively the same population as Ontario County inquiring as to which method of sale was used in their respective counties. Without objection their replies were received in evidence to show the practice. It appears that sixteen of these counties use the public auction method, eight the sealed bids, and four use both methods. It therefore seems reasonable to assume that many of the remaining thirty-four counties of the State are using the sealed bid method, or perhaps both methods.

It appears that the Legislature when intending that a sale should be conducted by receiving oral bids have used the term " public auction " as evidenced by sections 120 and 151 of the Tax Law providing for the sale of real property by State and county officials in the collection of taxes, and also by section 986 of the Civil Practice Act providing for the sale of real property made in pursuance of a judgment in an action affecting the title to real property. The term " public sale " instead of " public auction " is used in said subdivision 3 of section 106 of the Social Welfare Law thereby indicating some distinguishing intent on the part of the Legislature. The phrase-

ology used does not limit the method of sale to that of oral bids or sealed bids. Surely a public sale by sealed bids preceded by a notice in form and published in conformity with the provisions of said section 106 can not be termed a private sale. A reasonable interpretation of the phraseology used seems to be that although the public welfare official is required to publish a notice inviting the public generally to bid upon the sale he is permitted to determine whether such bids shall be oral at public auction or sealed bids to be opened at an appointed time when all bidders may be present if they so desire. The provisions of section 106 vest substantial discretionary powers in the public welfare official (see subd. 2, par. [b] where appear the words " may, in his discretion ", and subd. 2, par. [d] using the words " may, when in his judgment it is advisable and in the public interest "). The last sentence of subdivision 3 of section 106 vests further discretionary powers in the public welfare official and again indicates that the Legislature by use of the term " public sale " did not intend to exclude sales upon sealed bids. That sentence reads: " Unless in the judgment of the public welfare official, it shall be in the public interest to reject all bids, such parcel or mortgage shall be sold to the highest responsible bidder ". He is empowered in his discretion to reject all bids in the public interest and in any event to determine whether the highest bidder is responsible. By receiving sealed bids he is afforded a reasonable time in which to investigate as to the responsibility of bidders after the bidding has closed and before finally accepting any bid. The making of such an investigation is more practical under a sale upon sealed bids than at public auction by oral bids. There can be no question that a sale at public auction by oral bidding constitutes a public sale, and it is my opinion, for the reasons above stated, that a sale upon sealed bids after publication of a proper notice constitutes a public sale. I therefore find that the Legislature in adopting the phraseology found in subdivision 3 of said section 106 intended that the public welfare official might in his discretion adopt either method of sale. I therefore hold that the sale upon sealed bids by the Public Welfare Commissioner of the lands involved in the instant case to plaintiff Jesse R. Goodman, Jr. constituted a " public sale " as required by subdivision 3 of section 106 of the Social Welfare Law.

As an affirmative defense defendants allege that the amount of land to be conveyed was misrepresented to them when they

signed the offer to purchase. The offer to purchase and acceptance contract, prepared by plaintiffs' broker, described the property as " a six room house and poultry house on a lot about ¾ of an acre or per deed to you ". The deed conveying the property to plaintiffs gave the amount of land as " one-half of an acre of land, be the same more or less ". The broker testified that he knew nothing about the boundary lines and that nothing was said about them when defendants signed the purchase offer. When asked if he was under the impression that there was three quarters of an acre of land, he replied: " That was the way it was given to me. I had no way of telling ". He also testified that the words " as per deed to you " were inserted in the contract as a precaution that is taken so that if there is a slight deviation one way or another it still would be a good contract. Plaintiff Updyke testified that he knew the deed to plaintiffs called for one-half acre more or less, and that the contract with defendants described the land as three quarters of an acre. Plaintiffs Jesse R. and John Goodman both testified that they knew their deed called for one-half acre of land; that they read and examined the purchase offer and acceptance contract when they signed it and knew that it described the land as three quarters of an acre. Defendant Leon E. Fisher testified that he asked the broker " how many acres there is really here ", but did not state what the broker replied. The broker says that no mention of the quantity of the land was made by him or the defendants. Both Fisher and his wife swore that they relied upon the statement in the contract that the land consisted of about three quarters of an acre and would not have signed the offer had they known there was only one half of an acre. The reasonable inference to be drawn from the broker's testimony is that the plaintiffs told him that there was three quarters of an acre. However, the source of his information is immaterial. He was the plaintiffs' agent and prepared the contract describing the land as about three quarters of an acre. Plaintiffs knew of this error when they signed the contract. While it was their duty to do so, the plaintiffs failed to have it corrected or to advise defendants concerning it. Upon the record in this case the fact that defendants had seen the property did not relieve the plaintiffs of the duty to reveal the misleading and erroneous description of land in the contract. The difference of one fourth of an acre on a farm might not be material but on a small lot it is not a " slight " but rather a substantial deviation. Defendants

may not be compelled to accept one-third less land than their contract called for — a shortage of 10,890 square feet. (See *Friedman* v. *Baron*, 223 App. Div. 851, affd. 250 N. Y. 552; and *Paul* v. *Swears*, 138 App. Div. 638, appeal withdrawn, 203 N. Y. 615.)

The failure of the plaintiffs to act with reasonable dispatch with reference to the alleged defects in the title warrants consideration. The contract between the parties was executed July 28, 1952, and provided that the sale should be completed on or before August 9, 1952. Soon after August 12th, plaintiffs caused to be delivered to defendants' present attorney an abstract of title. He returned the same to plaintiffs' attorney with a letter dated August 29th, stating therein that in his opinion the title offered was not a good and marketable title for the reason that " there are some defects which undoubtedly could be corrected, such as appears at abstract No. 3 ", but that his most serious objection was based on the fact that at the time the premises were sold to plaintiff Jesse R. Goodman, Jr. by the Commissioner of Public Welfare of Ontario County, as appears at Abstract No. 8, such sale was made upon sealed bids instead of oral bids at public auction. The letter further advised that the defendants refused to accept the offered title for these reasons and demanded a return of the down payment of $500. Reference to Abstract No. 3 involved the question as to who might have been the heirs of a former owner of the premises, there being no record in the Surrogate's office pertaining to her estate. By letter dated September 4, 1952, plaintiffs' attorney advised defendants' attorney that if defendants would not accept the title the plaintiffs would take legal action. During the ensuing six months no move was made by plaintiffs either by way of taking legal action or attempting to cure the defects in the title, except that plaintiffs' attorney suggested that his clients might arrange to have the title insured. This offer was not acceptable to the defendants. On March 18, 1953, plaintiffs' attorney wrote defendants that they still stood ready to perform the contract and deliver a warranty deed, and " stand ready to do whatever is necessary to complete the sale ", and that an action in specific performance would be commenced upon defendants' failure to accept title to the property. Five days later defendants' attorney replied to that letter stating that the defendants refuse " to accept anything but a marketable title " to the premises.

On March 25, 1953, this action was commenced by service of the summons and complaint, and issue joined by service of defendants' answer on April 4th, and plaintiffs' reply on May 18th. Upon the trial, *fifteen months* after the defendants first notified plaintiffs that they would not accept the title because it was not marketable for the reasons stated and demanded return of their down payment of $500, plaintiffs produced a verified transcript from the Register of Deaths, dated June 18, 1953, showing the death on September 11, 1921, of Caroline Elizabeth Glimpse, a former owner of the premises here involved, and also an acknowledged declaration dated June 19, 1953, naming her only surviving heirs and next of kin. These instruments were offered to meet one of the objections set forth in defendants' first notice of rejection of the title. They apparently cured that alleged defect in title. However, there is nothing in the record to indicate that they were submitted to the defendants or their attorney at any time prior to the trial, and in fact were not even procured by the plaintiffs until in June, 1953, — some *three months* after commencing this action and about *ten months* after defendants first notified them of that alleged defect in the chain of title. While plaintiffs were entitled to a reasonable length of time in which to perfect their title, if such action were required, it seems that ten months after notice of the defect and three months after commencement of the action is unreasonable under the circumstances here obtaining.

The defendants, at the time of signing the contract with plaintiffs, had sold their farm and were required to give possession to the purchaser. They were confronted with the necessity of purchasing another property as a home — not as a speculation. It is true that five days after their attorney had written plaintiffs' attorney rejecting the offered title to the premises here involved the defendants purchased another property where they now reside. Under ordinary circumstances plaintiffs of course would be allowed more than five days in which to perfect their title. But an unusual situation obtained in this instance. The defendants were not relying solely upon the advice of their present attorney. They had first submitted the abstract of title to another attorney who admittedly is an authority on real estate matters. He advised that plaintiffs did not have a good marketable title because of the question as to whether a former sale of the property by the public welfare official under sealed bids constituted a " public sale " as required by statute, and in a letter of August 18, 1952, to plaintiffs' present attorney named other

attorneys who had in other transactions rejected title for the same reason. This question apparently could only be determined by a judicial decision which obviously might require many months to obtain. Confronted with these facts it seems the defendants were justified in assuming that they were relieved of any obligation to perform under their contract with the plaintiffs. If they accepted title the same question might arise in case they later attempted to sell the property. Under such conditions it does not seem that the defendants should be required to wait until an action for specific performance is brought against them to have plaintiffs' title cleared. (See *Kielbinski* v. *Sitko* 194 Misc. 408.) In *Lynbrook Gardens* v. *Ullmann* (291 N. Y. 472, 477), the court said: " A decree of specific performance does not compel a purchaser to accept a doubtful title where the decree itself constitutes an authoritative determination of the questions of law which until that time were not free from doubt ".

Under the facts and circumstances disclosed by the record in this case equity will not compel the defendants to perform under their contract with the plaintiffs. Defendants are entitled to judgment dismissing the complaint and directing that plaintiffs pay to defendants $500, representing their down payment on the contract, with interest thereon from July 28, 1952, and the further sum of $550 as and for their counsel fees, together with the costs and disbursements of this action.

Findings and proposed judgment may be submitted accordingly.